# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MICHAEL LYNN CASH, | ) |
| Plaintiff, | ) |
| v. | ) No. CIV 14-245-JHP-SPS |
| GALIAN MURPHY, et al., | ) |
| Defendants. | ) |

## OPINION AND ORDER

This action is before the Court on the defendants' motions for summary judgment. The Court has before it for consideration Plaintiff's complaint (Dkt. 1), Defendants' motions (Dkts. 46, 47), Plaintiff's responses to the motions (Dkts. 61, 62, 63, 66), and Defendants' replies (Dkts. 64, 65).

Plaintiff, an inmate at the Coleman Federal Correctional Complex in Coleman, Florida, brings this action under the authority of 42 U.S.C. § 1983, seeking relief for alleged constitutional violations during his incarceration at the Okmulgee County Criminal Justice Authority (OCCJA) (Dkt. 1). The defendants are Galian Murphy, OCCJA Chief of Security; Tammy Brown, OCCJA Captain; Misty Wallace, OCCJA Sergeant; and Okmulgee County, Oklahoma.

Plaintiff alleges Defendants Murphy, Brown, and Wallace failed to protect him from a substantial risk of serious harm. Defendants Murphy and Wallace allegedly told other inmates to blame Plaintiff for reduced recreation at the OCCJA. As a result of the action or inaction of Defendants Murphy, Brown, and Wallace, Plaintiff was assaulted by other inmates and received serious physical, mental, and emotional injuries. Defendants Murphy, Brown, and Okmulgee County allegedly were deliberately indifferent to Plaintiff's serious medical needs, when they hindered the prescribed treatment for Plaintiff's injuries, resulting in additional injury. Plaintiff further claims Murphy retaliated against him after Plaintiff

complained about the allegedly unconstitutional conditions of confinement at the OCCJA. (Dkt. 1 at 18-19). Plaintiff sets out his specific allegations as follows:

On March 22, 2011, he was arrested in Durant, Oklahoma, for various state charges, and on August 15, 2011, he was transferred to the Muskogee County Jail with state and federal charges. On January 26, 2012, he was transferred to OCCJA to utilize its law library, which was not available in the Muskogee County Jail.

Plaintiff claims that shortly after his arrival at OCCJA, he noticed a pattern of multiple constitutional violations at that facility. On May 8, 2012, he filed a Request to Staff (RTS) for several issues, including extended denial of recreation and unprovoked, excessive use of force (pepper spray) by OCCJA staff. The next day, Defendant Murphy interviewed Plaintiff about the issues presented in the RTS. Plaintiff alleges that, as a direct result of the interview, Murphy reduced recreation periods for the entire facility. Defendants Murphy and Wallace told the inmates to "blame [Plaintiff] for the reduction in recreation."

Because even the one-hour recreation period was being denied, Plaintiff requested a grievance form on May 31, 2012, so he could begin the administrative exhaustion process for this issue. Within minutes of requesting the form, Detention Officer Lovell ordered Plaintiff to pack his property to facilitate a move. Plaintiff asked to speak to the person who had ordered his move and was escorted to Defendant Murphy's office. Plaintiff informed Murphy that he had an absolute right to pursue a grievance without retaliation in the form of a move. Murphy told Plaintiff that Murphy could "move anyone, anywhere, for any reason." Murphy then forced Plaintiff to move to Cellblock F-2 because of the grievance form request. Plaintiff asserts this cellblock is known as "Murphy's Island."

Plaintiff claims that several inmates have been assaulted and extorted, and their property has been stolen in Cellblock F-2. The inmates, however, fear making complaints, because they can be moved to this cellblock in retaliation. When Plaintiff moved into this cellblock, the other inmates told him it was Plaintiff's fault that recreation had been reduced.

Plaintiff asserts this cellblock was extremely over-capacity, creating a hostile

environment. Tools such as mops, broom sticks, and mop ringers always were left unsupervised for long periods of time, and it was known that these objects had been used as weapons. In addition, the inmates allegedly had turned the security camera on the recreation yard to face the wall, obscuring the area from visual supervision by staff.

On June 6, 2012, Plaintiff wrote a RTS to Defendant Brown, alleging he was moved to Cellblock F-2 out of retaliation, and Defendant Wallace was telling inmates to blame Plaintiff for the reduced recreation (Dkt. 1 at 29). Brown's answer stated, "I moved you because I can [and] you or no one else is assigned to one pod for your stay here," although Plaintiff asserts it was Defendant Murphy who ordered the move. Plaintiff's RTS also requested a discussion with Brown about the safety and retaliation issues, but it never occurred.

On June 18, 2012, Plaintiff and Inmate Morgan engaged in a verbal argument, and Morgan lured Plaintiff to the recreation yard to "discuss it." Morgan then sucker-punched Plaintiff in his left eye. Plaintiff claims he successfully defended himself against Morgan, until several other inmates started hitting and kicking Plaintiff. The attackers cornered Plaintiff, and one them said to get a shank from Inmate O'Dell's mattress. The inmates attacking Plaintiff said that Plaintiff had brought too many problems to the pod, obviously in reference to Plaintiff's problems with the OCCJA staff and the reduction in recreation. In fear for his life, Plaintiff broke loose, ran for the door, and locked the other inmates on the recreation yard.

Plaintiff went straight to Inmate O'Dell's mattress and retrieved the metal rod to prevent it from being used on him and to have it for self-defense. He then realized he had torn his right biceps tendon while forcing off the other inmates during the altercation. The other inmates managed to open the recreation yard door and immediately came into the cellblock to look for Plaintiff and continue the attack. Plaintiff was unsure of which inmates had attacked him, so he warned all the inmates to stay back. Plaintiff returned to his cell as the inmates advanced on him. Plaintiff complied with the inmates' demand that he give them

3

the shank, thinking the attack would stop. Instead, the inmates threw a mop ringer at him, hitting him on the head.

Inmate Williams then grabbed a broom and broke it over his knee, before entering Plaintiff's cell. Williams stabbed Plaintiff in his back, head, and elbow. At the same time, several inmates attacked Plaintiff with food trays and punched him. After several minutes, Plaintiff was able to break free and run out of his cell to the door leading to the main corridor. Several minutes later, Defendant Murphy arrived and escorted Plaintiff to an area where Plaintiff waited about an hour for transport to the hospital. Plaintiff asked Murphy to retrieve his property from Cellblock F-2, but Murphy returned with two inmates carrying only a small portion of Plaintiff's property. Murphy told Plaintiff that "this is all your [sic] getting back."

Plaintiff was driven to the Okmulgee Memorial Hospital, where he received treatment for several open wounds and was prescribed follow-up with a specialist in one to two weeks. When he was returned to the jail, he was placed in solitary confinement, but none of his attackers was placed in solitary confinement or punished with loss of privileges.

Plaintiff verbally complained about his injury to the OCCJA medical staff who advised that they act only as directed by the U.S. Marshals Service (USMS), and Plaintiff's treatment was out of their hands. On June 21, 2012, OCCJA medical staff contacted the USMS about Plaintiff's injury to his arm, and on June 25, 2012, Plaintiff wrote a letter to Defendant Brown regarding his injury and stolen property. (Dkt. 1 at 33-34). On June 28, 2012, Plaintiff was seen by Dr. Jerry Cole who ordered surgery. (Dkt. 1 at 31).

On July 6, 2012, Plaintiff allegedly was taken from his isolation cell and served a breakfast tray by OCCJA staff, which he began eating. Plaintiff did not know his surgery was scheduled for that day because of standard security protocol not to inform inmates of non-judicial appointments. He then was transported to the Okmulgee hospital where the surgery was cancelled, because Plaintiff had eaten that morning. Dr. Cole refused to reschedule the surgery because of noncompliance with the order that Plaintiff was not to eat

4

before surgery. (Dkt. 1 at 36).

When Plaintiff returned to the jail, Defendant Murphy told him the USMS was angry that the surgery had to be cancelled, because there had been a great deal of arrangements and planning to schedule it. Plaintiff reminded Murphy that he was unaware of the surgery schedule, but Murphy said the USMS might not be able to find another doctor who was willing to perform the procedure, and the delay was causing the biceps to "knot up."

On July 12, 2012, Plaintiff's father contacted the USMS to discuss why Plaintiff could not get another appointment. The U.S. Marshal told Plaintiff's father that Plaintiff did not really want the surgery, and the Marshal advised that Plaintiff should write a letter stating he actually did want to have the operation. Plaintiff immediately wrote a letter to the Marshal stating he wanted the surgery, and he never said he did not want it.

On July 23, 2012, Plaintiff was seen by Dr. Phillips in Tulsa who advised that the delay in surgery could result in an unsuccessful outcome because of scar tissue. After an MRI, the surgery was performed on August 28, 2012. Dr. Phillips successfully reattached the tendon, but the injury left Plaintiff's arm permanently deformed and his biceps muscles remain "knotted up" near his shoulder. He also has constant pain with simple movements.

After surgery, Plaintiff returned to OCCJA and was assigned to "medical observation." OCCJA Warden McCoy then agreed to allow him back into the general population, where he would have access to telephones, television, and potential witnesses. On September 28, 2012, he was moved to a pod where he was safe from his attackers. Within 30 minutes of the move, however, Defendant Murphy demanded that Plaintiff be relocated into isolation, claiming that Plaintiff had threatened him. Plaintiff, therefore, was moved back into a single cell, and in a phone conversation, McCoy allegedly acknowledged to Plaintiff that Murphy was retaliating against him. McCoy also allegedly said he would not contradict his staff on this issue, so Plaintiff was ordered back into isolation.

The next morning, Plaintiff noticed that his cell door was not opened unless two officers were present. He remained in isolation until October 10, 2012, the date of his federal

sentencing. He was transferred back to the general population of the Muskogee County Jail, and on May 3, 2013, Plaintiff was approved for "general surgery" to attempt additional repair to his biceps injury.

**Standard of Review**

The defendants have filed motions for summary judgment. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* In making this determination, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. However, a party opposing a motion for summary judgment may not simply allege there are disputed issues of fact; rather, the party must support its assertions by citing to the record or by showing the moving party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c). Thus, the inquiry for this Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

Because Plaintiff is a pro se litigant, the Court construes his pleadings liberally. *Haines v. Kerner*, 404 U.S. 519 (1972). This relaxed standard, however, does not relieve his burden of alleging sufficient facts on which a recognized legal claim could be based. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

**Defendant Okmulgee County**

Defendant Okmulgee County alleges in its motion for summary judgment that the Okmulgee County Criminal Justice Authority (OCCJA) is a jail trust established under the laws of the State of Oklahoma for the purposes of operating a county jail in Okmulgee County, Oklahoma (Dkt. 46-1, Trust Indenture). The OCCJA contracts with the State of

Oklahoma and Federal Departments of Corrections to provide housing for state and federal inmates and detainees (Dkts. 46-4, Affidavit of OCCJA Executive Director John Martin; 46-4, Contract with Oklahoma Department of Corrections; 46-5, Contract with United States Marshals Service).

Defendant Okmulgee County further alleges, among other things, that it is not an entity subject to suit under Oklahoma law. The right to sue a county in the State of Oklahoma is purely statutory, and the mode prescribed by statute for prosecuting actions against a county must be strictly followed. *Smith v. State*, 166 P. 463 (1917). The statutory procedure for naming a county as a defendant is found at Okla. Stat. tit. 19, § 4, which specifically provides that "In all suits . . . against a county, the name in which a county shall . . . be sued shall be, 'Board of County Commissioners of the County of _____. . . .'" The Supreme Court of Oklahoma continually has stated that "[t]his statute is mandatory and requires that all suits prosecuted by or against a county be prosecuted in the name of the board of county commissioners of the county in interest." *Green Construction Co. v. Okla. County*, 50 P. 625, 627 (Okla. 1935). Therefore, the Board of County Commissioners of the County of Okmulgee would be the only properly-named party.[1]

Because Plaintiff named an improper party, no valid summons could be issued to or served on the county. *Id.* Furthermore, any summons issued and served did not confer jurisdiction over the county. *Id.* Therefore, Defendant Okmulgee County is entitled to dismissal from this action, and Okmulgee County's motion for summary judgment (Dkt. 46) is GRANTED.

**Failure-to-Protect Claim Against Defendant Tammy Brown**

Defendant Brown alleges she is entitled to summary judgment on Plaintiff's failure-to-protect claim, because this claim against Brown is barred by the applicable statute of limitations. The statute of limitations for a civil rights cause of action in Oklahoma is two

---

[1] On December 21, 2015, the Court denied Plaintiff's motion to substitute the OCCJA for Defendant Okmulgee County (Dkt. 50).

years. *Meade v. Grubbs*, 841 F.2d 1512, 1522 (10th Cir. 1988). "Federal law controls questions relating to accrual of federal causes of action. A civil rights action accrues when the plaintiff knows or has reason to know of the injury which is the basis of the claim." *Baker v. Bd. of Regents*, 991 F.2d 628, 632 (10th Cir. 1993) (citations omitted).

Here, Plaintiff's claim is premised on acts that are alleged to have occurred on or before June 18, 2012 (Dkt. 1 at 10). Plaintiff, however, did not file his complaint until June 20, 2014, past the two-year deadline (Dkt. 1). Furthermore, Defendant Brown was not a party to Plaintiff's prior civil rights case, *Cash v. Wallace*, No. CIV-12-337-JHP-SPS, which was dismissed without prejudice on May 27, 2014. Therefore, Oklahoma's one-year saving statute, Okla. Stat. tit. 12, § 100, does not apply to Plaintiff's failure-to-protect claim against Defendant Brown.

Plaintiff alleges he first attempted to file his complaint on June 10, 2014, but the Court Clerk returned it pursuant to Local Civil Rule 3.2, because it was not accompanied by a proper motion for leave to proceed *in forma pauperis* or the filing fee (Dkt. 66 at 6). This date, however, cannot be used as a filing date, because the Court did not accept the document for filing.

Plaintiff argues he placed his complaint in the prison mail on or before June 18, 2014, and he therefore is entitled to the benefit of the "prison mailbox rule" (Dkt. 62 at 8). Under the prisoner "mailbox rule" of *Houston v. Lack*, 487 U.S. 266, 270, 276 (1988), a pro se prisoner's document is deemed to have been "filed" when the prisoner delivers the pleading to prison officials for mailing. *See also Burger v. Scott*, 317 F.3d 1133, 1137 n.3 (10th Cir. 2003). However, to benefit from the mailbox rule, the document must be deposited in the prison's legal mail system, not the prison's regular mail system. *United States v. Leonard*, 937 F.2d 494, 495 (10th Cir. 1991). When there is no separate legal mail system with a legal mail log, the pleading is considered filed when it is placed in the prison's regular mail, if it contains a declaration in compliance with 28 U.S.C. § 1746. *United States v. Gray*, 182 F.3d 762, 765-66 (10th Cir. 1999).

Here, Plaintiff has provided no evidence that he placed his complaint in the prison mail on or before June 18, 2014, other than his unsworn, self-serving statements. The complaint does state it was verified by Plaintiff on June 17, 2014 (Dkt. 1 at 6), but there is no evidence, such as a prison mail log indicating the mailing date, to support Plaintiff's claim that the complaint was timely filed. The Court, therefore, finds Defendant Brown is entitled to summary judgment on Plaintiff's failure-to-protect claim, because this claim against Brown is barred by the statute of limitations.[2]

**Failure-to-Protect Claim against Defendants Galian Murphy and Misty Wallace**

Defendants Murphy and Wallace allege they also are entitled to summary judgment on Plaintiff's claim that they failed to protect him. To establish liability for an Eighth Amendment failure-to-protect claim, an inmate first must show that the conditions of his confinement posed an objective, "substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Second, he must show that prison officials had a subjective knowledge of this risk, but nevertheless recklessly disregarded that risk. *See id*. at 839-40. The subjective element requires a showing of a "sufficiently culpable state of mind," amounting to a "deliberate indifference" to the substantial risk of serious harm to the inmate. *Id.* at 834. "[T]he official[s] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id.* at 837. "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 410 (1997). "It is obduracy and wantonness, not inadvertence or error in good faith," that violate the Constitution. *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

The record shows that following Plaintiff's move to the Cellblock F-2, he and other inmates complained that some pods received more recreation time than other pods. (Dkt. 47-

---

[2] Even if the complaint had been timely filed, the discussion below shows that Plaintiff would not have been entitled to relief on his failure-to-protect claim against Defendant Brown.

9

10, Affidavit of Galian Murphy). Defendant Murphy instructed the detention officers to give equal recreation time to the inmates, and to allow all pods the time required by the Oklahoma Jail Standards. *Id.* The compliance with Oklahoma Jail Standards, in conjunction with ensuring that all pods received equal recreation time, reduced by a few minutes the recreation time for some pods. *Id.* Defendants Murphy and Wallace maintain the reduction in recreation time for some pods was not done to retaliate or punish any prisoner or detainee, and they deny attributing the reduction in recreation to Plaintiff. (*Id.*; Dkt. 47-15, Affidavit of Misty Wallace; Dkt. 47-2, Affidavit of John Martin; Dkt. 47-21, Oklahoma Jail Standards).

On June 18, 2012, Plaintiff got into an argument with another inmate regarding a debt arising from a bet on a volleyball game that allegedly was owed to Plaintiff. (Dkt. 47-22, Statement by Plaintiff; Dkt. 47-23 at 68-75, Plaintiff's Depo.). Plaintiff admits he called out the other inmate for a fight in the recreation yard for disrespecting him. *Id.* Plaintiff and the other inmate then got into a physical altercation in the recreation yard that Plaintiff claims ended with choking out the other inmate. *Id.* Plaintiff claims that immediately after the fight, eight or nine other inmates who had been watching in the recreation yard charged at Plaintiff, saying he started too much trouble. (Dkt. 47-24 at 75-76, Plaintiff's Depo.).

Plaintiff claims he was backed into a corner with the other inmates punching him, when one said they should get the shank in one of the inmate's mats. (Dkt. 47-25 at 79-81, Plaintiff's Depo.). Plaintiff claims he knew there was a shank in the pod, but he did not know its location until this statement was made. *Id.*

When Plaintiff heard the talk about the shank, he became afraid for his life, and he pushed off the other inmates who were attacking him, injuring his biceps. (Dkt. 47-26 at 81-82, Plaintiff's Depo.). He claims he ran from the recreation yard and shut the door to the yard. *Id.* He did not use the intercom button just inside the doorway to call for help. (Dkt. 47-26 at 84, Plaintiff's Depo.). Plaintiff then entered the pod, grabbed a mattress, and took it into his cell. (Dkt. 47-28, Video of Events of June 18, 2012; Dkt. 47-2, Affidavit of John

Martin; Dkts. 47-29 & 47-30, Investigation Report; Dkt. 47-22, Plaintiff's Statement; Dkt. 47-31 at 88-89, Plaintiff's Depo.). He then returned an apparently torn mattress from his cell. *Id.* He acknowledges he then returned to the pod and retrieved a shank from the mattress. *Id.*

Plaintiff next exited his cell with a shirt or rag around his wrist and holding a sharpened metal rod. *Id.* He threatened other inmates, including those who had not been on the recreation yard, and the other inmates retreated from Plaintiff's threatening behavior. (Dkt. 47-28, Video of Events; Dkt. 47-2, Affidavit of John Martin; Dkt. 47-29, Investigation Report). Other inmates in the pod picked up food trays and approached Plaintiff, who stood between the railing near the stairs and the doors of the individual cells in the pod. *Id.* In an attempt to get the weapon from Plaintiff, the other inmates threw the food trays at him, closed in on him, and took the metal rod from him. *Id.* During this altercation, an inmate found a broom handle in Plaintiff's cell. (Dkt. 47-8, USMS Synopsis of Cash Stabbing; Dkt. 47-29, Investigation Report; Dkt. 47-32 at 93-94, Plaintiff's Depo.). The inmate broke the broom handle in two and stabbed Plaintiff in his right arm. *Id.*

Following the incident, the USMS conducted an investigation, because Plaintiff was a federal detainee. (Dkt. 47-8, USMS Synopsis of Cash Stabbing). A second investigation was conducted by Sgt. King on behalf of the OCCJA. (Dkt. 47-29, Investigation Report). Other inmates were interviewed, and their statements were taken. *Id.* The inmates described Plaintiff's threats toward them and their efforts to remove the shank from Plaintiff. *Id.* It was determined that Plaintiff used a handmade shank from a mop bucket to threaten the other inmates, and the inmates who were threatened attempted to remove the shank from Plaintiff. (Dkt. 47-8, USMS Synopsis of Cash Stabbing).

After careful review, the Court finds there was no evidence that the other inmates were motivated to attack because of the alleged loss of recreation time, and Plaintiff was not placed in danger by any OCCJA employees. Furthermore, neither Defendant Murphy nor Defendant Wallace were present at the time of the altercation on June 18, 2012, and they

were not involved in any of the events of that day. (Dkt. 47-15, Affidavit of Defendant Wallace; Dkt. 47-8, USMS Synopsis of Cash Stabbing; Dkt. 14-29, Investigation Report of Toni King, including witness statements).

The Court further finds Plaintiff cannot establish either the objective or the subjective elements required to support a failure-to-protect claim against Defendant Murphy or Defendant Wallace. There is no genuine dispute as to any material fact, and Defendants Murphy and Wallace are entitled to summary judgment on this claim.

**Medical Care**

Plaintiff alleges Defendants Murphy, Brown, and Wallace were deliberately indifferent to his medical needs after the altercation. In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court addressed the Eighth Amendment prohibition against cruel and unusual punishment in the context of medical attention:

> [D]eliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under §1983.

*Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (citations and footnotes omitted).

Deliberate indifference involves both an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A prisoner first must produce objective evidence that the deprivation at issue was in fact "sufficiently serious." *Id*. (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "A medical need is serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996) (internal quotation marks omitted). The subjective component is met if a prison official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 at 837. "[T]he official must both be aware of facts from

which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

The record shows that within minutes of the incident on June 18, 2012, Nurse West appeared and provided medical care to Plaintiff. (Dkt. 47-35, Affidavit of Nurse West). He "almost immediately" was transported to Okmulgee Memorial Hospital (OMH), where he received treatment. (*Id.*; Dkt. 47-36, Plaintiff's OMH Records). Plaintiff was treated at the hospital for multiple contusions on his face and lacerations on his right arm. (Dkt. 47-36, Plaintiff's OMH Records). He underwent X-rays and a CT scan and was treated with intramuscular injections, a finger splint, and an arm sling before being discharged. (Dkt. 47-37, Plaintiff's OMH ED Discharge/Transition Sheet).

The physicians at OMH recommended a follow-up in one to two weeks to check Plaintiff's right arm biceps. *Id.* However, Nurse Freeman checked Plaintiff on June 19, 2012, and recommended that Plaintiff see Dr. Garis. (Dkt. 47-38, Progress Note dated 06/19/2012; Dkt. 47-39, Affidavit of Nurse Freeman; Dkt. 47-40, Note from Nurse Freeman dated 06/20/2012). On June 21, 2012, Dr. Garis saw Plaintiff, recommended a surgical consultation, and prepared a medical request for Plaintiff. (Dkt. 47-40, Progress Note dated 06/ 21/2012; Dkt. 47-41, Prisoner Medical Request dated 06/21/2012).

On June 28, 2012, Plaintiff had a surgical consultation with Dr. Jerry Cole, who recommended surgery for Plaintiff on July 5, 2012. (Dkt. 47-42, Memo from Jerrry Cole, D.O. dated 6/28/2012). On July 3, 2012, Plaintiff was approved for repair of a ruptured biceps, secondary to the altercation. (Dkt. 47-43, Doctor's Notes dated 7/2/2012). Plaintiff was advised to fast after midnight prior to the day of his surgery. (Dkt. 47-8, USMS Synopsis of Cash Stabbing; Dkt. 47-33, OCCJA Response to Medical Request dated 7/3/2012; Dkt. 47-35, Affidavit of Nurse West).

On July 3, 2012, Nurse West notified the officers assigned to the F Pod that Plaintiff was to have no food after midnight on July 5, 2012. (Dkt. 47-44, OCCJA Response to Medical Request dated 7/3/2012). However, Plaintiff was observed taking another inmate's

tray and eating before being taken to OMH for his surgery, and Plaintiff acknowledged that he had violated the order to fast after midnight. (Dkt. 47-8, USMS Synopsis of Cash Stabbing). Consequently, Dr. Cole, who is not affiliated with OCCJA, canceled the surgery and advised Plaintiff he would not perform the surgery because of Plaintiff's non-compliance with the order to fast after midnight. (*Id.*; Dkt 47-45, OMH Progress Notes dated 7/6/2012).

Dr. Garis continued to monitor Plaintiff, visiting him on July 12, 2012. (Dkt. 47-46, Progress Note dated 7/12/2012). The next day, the USMS approved another surgical consultation for Plaintiff, which was scheduled for July 23, 2012. (Dkt. 47-47, Prisoner Medical Request dated 7/13/2012). Plaintiff saw Dr. Peter Duncanson at the Warren Clinic in Tulsa, Oklahoma on July 23, 2012). (Dkt. 47-48, Plaintiff's Warren Clinic Records). Dr. Duncanson ordered an MRI on Plaintiff's arm and later perform the surgery Plaintiff had requested. (*Id.*; Dkt. 47-49, Plaintiff's Medical File). After the altercation, the USMS consulted with the OCCJA and concurred with a decision to place Plaintiff in isolation upon his return to the OCCJA facility, for his own safety and that of others he had threatened. (Dkt. 47-8, USMS Synopsis of Cash Stabbing).

Upon review of the record, the Court finds the acts complained of do not show deliberate indifference to Plaintiff's medical needs as alleged. It is clear from the record that medical care was provided. Where there is such evidence of a "series of sick calls, examinations, diagnoses, and medication . . . it cannot be said there was a 'deliberate indifference' to the prisoner's complaints." *Smart v. Villar*, 547 F.2d 112, 114 (10th Cir. 1976).

To the extent Plaintiff is complaining of the delay in his treatment, "delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference which results in substantial harm." *Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993) (quoting *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993)). The delay caused by Plaintiff's eating the morning of his first scheduled surgery did not result in substantial harm. Therefore, Plaintiff did not suffer a constitutional violation. Further, Defendants

Murphy, Brown, and Wallace's motion for summary judgment with regard to Plaintiff's medical care is granted.

**Retaliation Claim**

Plaintiff also asserts a claim against Defendant Murphy for unconstitutional retaliation. Plaintiff alleges Murphy transferred him to F Pod in retaliation for Plaintiff's exercise of his First Amendment rights in complaining about the conditions of his confinement (Dkt. 1 at 19). Murphy alleges he is entitled to summary judgment on this claim, because there is no evidence to support the claim.

"[P]rison officials may not retaliate against or harass an inmate because of the inmate's exercise of his constitutional rights. . . . [However], [a]n inmate claiming retaliation must allege *specific facts* showing retaliation because of the exercise of the prisoner's constitutional rights." *Fogle v. Pierson*, 435 F.3d 1252, 1263-64 (10th Cir. 2006) (quoting *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998) (emphasis in original)), *cert. denied*, 549 U.S. 1059 (2006). An inmate claiming unconstitutional retaliation also "must prove that 'but for' the retaliatory motive, the incidents to which he refers . . . would not have taken place." *Peterson*, 429 F.3d at 1144 (quoting *Smith v. Maschner*, 899 F.2d 940, 949-50 (10th Cir. 1990)).

The record shows that Plaintiff was moved to F Pod for genuine penological reasons. Plaintiff was a federal pretrial detainee when he was booked into the OCCJA facility on or abut January 26, 2012. (Dkt. 47-6, Plaintiff's Book-in Summary). He was transferred from the Muskogee County Jail at his request for housing in a facility with a law library. (Dkt. 47-8, USMS Synopsis of Cash Stabbing). He originally was housed in the D Pod, which houses county and federal detainees and inmates. (Dkt. 47-2, Affidavit of John Martin; Dkt. 47-11 at 31-31, Plaintiff's Depo.). State DOC inmates and detainees are housed in the C Pod. *Id.* The C and D Pods are separate, but they share the same recreation yard. *Id.*

Soon after Plaintiff's arrival at the OCCJA, Defendant Murphy became aware of Plaintiff's father mailing items to other inmates who gave the mailings to Plaintiff, in

violation of facility policies. (Dkt. 47-10, Affidavit of Galian Murphy). Therefore, Murphy began an investigation into the situation. *Id.* Plaintiff also began communicating with DOC inmates at the door from C Pod to the recreation yard, in violation of requirements under the OCCJA contract with DOC. *Id.*

In March 2012, Defendant Murphy and Brown monitored Plaintiff's telephone calls to determine the source and method of the mailing of items to Plaintiff and to the other inmates who gave mailed items to Plaintiff. (Dkt. 47-13 Affidavit of Tammy Brown). During one phone call, Plaintiff instructed his father to mail money to DOC inmate Dave Atteberry, who was to receive money from Plaintiff's father and obtain commissary items for Plaintiff at the reduced commissary prices for federal inmates. *Id.* This plan risked violations of the contraband policies, and it threatened violations of the facility's contracts with the DOC. (Dkt. 47-4, Contract with DOC; Dkt. 47-5, Contract with USMS; Dkt. 47-10, Affidavit of Galian Murphy; Dkt. 47-18 at 33, Plaintiff's Depo.).

Brown notified the case manager of the DOC pod at the jail, and then monitored Inmate Atteberry's receipts. (Dkt. 47-13, Affidavit of Tammy Brown). Four days later, Atteberry received a $100 money order from Plaintiff's father Richard Cash. (Dkt. 47-19, Letter from Richard Cash to Dave Atteberry, dated 03/16/2012; Dkt. 47-20, Statement of Captain Brown dated 3/16/2016). In an effort to correct this problem and prohibit contact or communication between Plaintiff and DOC inmates, Chief Murphy moved Plaintiff from D Pod to the F-2 Cell in F Pod. (Dkt. 47-10, Affidavit of Galian Murphy).

Here, the Court finds Plaintiff has not shown a retaliatory motive by Defendant Murphy, and Plaintiff has not shown that "but for" such a motive, he would not have been placed in F Pod. Instead, Plaintiff only speculates that his transfer to F Pod was in retaliation for his complaints. "Constitutional rights allegedly invaded, warranting an award of damages, must be specifically identified. Conclusory allegations will not suffice." *Wise v. Bravo*, 666 F.2d 1328, 1333 (10th Cir. 1981) (citing *Brice v. Day*, 604 F.2d 664 (10th Cir. 1979), *cert. denied*, 444 U.S. 1086 (1980)). Defendant Murphy is entitled to summary

judgment on Plaintiff's retaliation claim.

**ACCORDINGLY,** Defendant Okmulgee County's motion for summary judgment (Dkt. 46) and Defendants Galian Murphy, Tammy Brown, and Misty Wallace's motion for summary judgment (Dkt. 47) are GRANTED, and this action is, in all respects, DISMISSED.

**IT IS SO ORDERED** this 17th day of October 2016.

_____
James H. Payne
United States District Judge
Eastern District of Oklahoma